NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3691-14T3

NICOLE PRAGER,

    Plaintiff-Appellant,

v.

JOYCE HONDA, INC.,

    Defendant-Respondent.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **August 22, 2016** |
| **APPELLATE DIVISION** |

Submitted May 23, 2016 — Decided August 22, 2016

Before Judges Sabatino, Accurso and
O'Connor.

On appeal from Superior Court of New Jersey,
Law Division, Morris County, Docket No. L-
2112-12.

Berkowitz, Lichtstein, Kuritsky, Giasullo &
Gross, LLC, attorneys for appellant (Colin
M. Page and John P. Harrington, on the
brief).

Weiler & Brandman, attorneys for respondent
(Michael F. Brandman and Francine M.
Chillemi, on the brief).

Smith Mullin, PC, attorneys for amicus
curiae National Employment Lawyers
Association of New Jersey, Inc. (James E.
Burden, on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Plaintiff Nicole Prager appeals from an involuntary dismissal at trial at the close of her case pursuant to Rule 4:37-2(b), dismissing claims of retaliation and constructive discharge by her employer, defendant Joyce Honda, Inc. Although we disagree with the trial court's stated reasons for entry of the order, we affirm because the proofs were insufficient to sustain a judgment in plaintiff's favor.

Viewed most favorably to her, plaintiff adduced the following facts at trial. Plaintiff was twenty years old and worked as a receptionist for Joyce Honda in Denville. She had been there eleven months when a customer of the dealership leaned over the counter while she was on the phone and tugged at the sleeve of her off-the-shoulder shirt, exposing her bra.

The matter was quickly referred to the service manager, who asked whether she wished to press charges. When plaintiff said she wasn't sure, the service manager told her she had fifteen minutes to decide and sent her back to her desk. When the service manager returned fifteen minutes later, plaintiff told him she did not know what to do. The two then met with the dealership's general manager.

By the time that meeting took place, managers had already reviewed surveillance video, which caught the incident on tape. The meeting began with a discussion between the general manager

and the service manager as to how many cars the customer bought and had serviced at the dealership. The man was a valued customer, having purchased about twenty cars over the years. He came into the dealership about twice a month to have one of his cars serviced. Plaintiff testified the general manager told her she had the right to press charges, but it would be unfortunate to lose such a valued customer. The general manager asked whether she would prefer that he call the customer to reprimand him. The meeting "left off along the lines that [the general manager] would contact [the customer] about . . . bringing him in to reprimand him and tell him he can't do things like that." Plaintiff testified she left the meeting feeling she "was allowed to make a complaint" but that "they'd be disappointed if I made that complaint."

Later that evening, plaintiff sent a text message to the service manager asking whether the general manager had called the customer, "[b]ecause I'm nervous he'll hate me whenever he comes in." The general manager had in fact called the customer, who had not returned his call.

Six days later, plaintiff sent an email to the vice president of the dealership, the general manager's boss and the son-in-law of the owner, with whom she enjoyed "an extremely friendly relationship." Plaintiff testified she sent the email

because she "felt discouraged by [the general manager] and after the relationship I had with [the vice president], I thought I could go to him."  The email began with plaintiff describing the incident and expressing her "total shock and disbelief after such random harass[ment] by one of our customers."  It continued as follows:

> Minutes later, I met with [three managers]. They discussed what had happened to me with [the customer] and proceeded to show me the incident which was caught by the security camera, they downloaded a copy of the clip. [The service manager] told me I had 15 minutes to press charges.  I truly didn't know what to do, I felt embarrassed and humiliated and pressured to make up my mind immediately.  I returned to my desk and 15 minutes later [the service manager] asked me if I made a decision, I told him I was unsure and that most of the employees were recommending I did, but I felt scared and very uncomfortable with the whole situation. At that point we met with [the general manager] and he asked me if I wanted an apology from [the customer], I responded no. The last thing I wanted [was] to see that man again.  I was also made clearly aware during the meeting that [the customer] was a good client who owns "five" Hondas and spends a lot of money with the dealership and it will be unfortunate to loose [sic] his business.
>
> [Vice president,] I was always very happy to work with Joyce Honda and all the employees. You have been a wonderful boss to work with and have shown me your support and friendship since I started working with your company.  As you know a couple of days ago we have [sic] discussed the possibility of me getting ahead and working on Saturdays in

the sales department.  You were not only helpful but very encouraging and I truly appreciate this opportunity.  I have always shown excellent customer service and would love to grow professionally in your firm. It was demoralizing to have to experience this type of behavior and sexual harassment from one of our customers.  Although initially my reaction was of fear and discomfort, now as days are passing by I feel angry, hurt and violated. I sincerely believe [the customer] should not be allowed near me, I wonder if he will assault me again or choose another female co-worker for his disgusting behavior.  I am reconsidering my early decision and I will press charges against [the customer].  [I]t will be wrong on my part to condone his actions.  I would like to discuss this matter with you personally so it is handled the right way without causing any repercussions for Joyce Honda and at the same time taking care of this incident in a just and fair way. Please let me know when we can meet to discuss this matter.

The following morning, the vice president called her into a meeting with the general manager.  The service manager was also present.  Plaintiff testified she was surprised to see the managers as she had "confided in [the vice president] the negative feelings [she] had towards them in the prior meeting."

Plaintiff testified the general manager began by asking why she had changed her mind about pressing charges.  She replied by saying that "other people were telling me that what happened to me was wrong, that I should press charges."  She testified the general manager responded by "reprimanding" her, "saying I was

acting like immature, I guess, just because I was a young girl, I didn't know how to handle this, that it was inappropriate I was discussing this with anybody." Plaintiff testified his response made her angry, "because I was already upset with him to begin with, and so him being there already was a bad taste and so I — I got mad. I answered back that I was allowed to speak to anybody I wanted." She testified that the general manager "got upset" and left the meeting.

The general manager, who plaintiff called in her case at trial, testified the vice president shared plaintiff's email with him before the meeting. He admitted expressing to plaintiff his view that she was handling the matter with a "lack of maturity." He explained that, "she went and she told the entire dealership about her personal business and it was coming back to me in such a way as though the dealership really didn't care about their employees, which is not true." He testified plaintiff responded by saying "in a very enraged way" that "she didn't have to tell [him] why she had changed her mind" and "could talk to whomever she wanted about this." He agreed he got upset and left the meeting.

The meeting ended with the vice president calling the police to report the incident with the customer. The police interviewed plaintiff at the dealership. The customer

6

thereafter pled guilty to a petty disorderly offense of offensive touching and paid a fine.

Plaintiff testified that after she filed her complaint against the customer, the work environment changed. She felt isolated and that people were avoiding her. About a week after she filed the complaint, she received two written warnings for leaving early without permission. The first warning related to an incident that had occurred four days before she filed her complaint against the customer. On that occasion, she switched Saturday shifts with a co-worker whose great-uncle had passed away. She testified she had explained to the co-worker that she could not cover the entire shift because she had a tanning appointment, and the two agreed the co-worker would come in when plaintiff had to leave. Plaintiff testified the plan worked as arranged and that she left the dealership that day without incident.

When plaintiff was asked on cross-examination whether she advised a supervisor that she would not be working the co-worker's entire shift, plaintiff responded, saying "I figure I must have but I was doing — I was doing Joyce Honda a favor that day, that wasn't my assigned shift, so I didn't — I didn't think I would have to stay until 5 o'clock if I was unable to."

A-3691-14T3

The dealership claimed plaintiff left without adequate staff coverage after two different managers denied her permission to leave. The general manager testified that after being denied permission to leave, plaintiff called her co-worker to cover the end of the shift. The co-worker arrived crying, and the dealership sent her home and covered her position until the end of the day. The general manager testified he directed the service manager to give plaintiff a written warning shortly after the incident, but the manager delayed doing so for reasons unknown.

The other warning was for an incident in which plaintiff allegedly again left early without authorization. Plaintiff claimed the same co-worker came in a couple of hours early to cover the end of plaintiff's shift. She claimed she advised the assistant service manager, who said it was fine so long as someone was at the desk. Plaintiff testified she had previously left early and had her co-worker cover "many times," without ever having previously been disciplined.

On cross-examination, plaintiff acknowledged time records and text messages to her supervisor documenting twenty-seven times in eleven months in which she had previously arrived late. She also corrected her prior testimony that she had never been late in the eleven months she worked for the dealership. She

A-3691-14T3

explained at trial that her "definition of late was not the same" as the questioner's. "I believe because I did give [my manager] a heads up and he okayed it, after that I just considered I was on time being we discussed a new time I would arrive."

Although plaintiff's first written warning was silent as to the consequences for further infractions, the second stated there could be time off without pay or termination should the incident occur again. The general manager testified he directed plaintiff be given the written warnings because:

> Prior to this, [plaintiff] would send a battery of e-mails. I'm going to be late, it's this, it's that. She would always communicate, which, to me, shows a sign of respect. Even though it was inappropriate, we were able to deal with it. It didn't really disrupt our business. But it had reached a point with [plaintiff] where she was no longer talking to her bosses, she was just making her own decisions. And I felt that that was the basis for now writing — writing her up and giving her a warning.

Plaintiff refused to acknowledge receipt of either warning. She admitted getting very upset during the meeting when she was presented the warnings, raising her voice and directing profanity at her supervisors. She testified the write-ups were "false," were not intended to be constructive and were designed as punishment. When asked on cross-examination what she thought the warnings were "punishment for[,] if not for not working

scheduled hours," plaintiff replied, "Because those weren't my scheduled hours. I was helping out someone whose uncle just died and no one was there to cover it, and I was getting written up for not being on shifts that weren't my assigned shifts."

The following day, the vice president and general manager, the service manager and the assistant service manager met with plaintiff to discuss her behavior at the prior day's meeting. The general manager testified the purpose of the meeting was to talk about the way she had reacted and to learn "why she blew up."

Plaintiff's counsel read into the record deposition testimony of the assistant manager, who claimed the general manager began the meeting "by talking to [plaintiff] and asking if we can get passed this and clear the air. If she had a problem, we would like to know what it is so that we can talk about it and we can try to resolve the issues and move forward." Plaintiff testified she responded by telling them the warnings "were bullshit and that this happened a million times before and that one happened ten days — ten days prior to me pressing charges and I didn't understand how I got two write-ups in one day after a year of no write-ups."

Plaintiff testified she told the vice president and managers the warnings were retaliation for her pressing charges

against a valued customer of the dealership and that her "anxiety was high enough that I was throwing up before work." The general manager responded by telling her that if "the job makes her feel that physically ill, that it would be in her best interest to most likely resign."

Plaintiff testified that after that meeting, she decided to leave the dealership. When her counsel asked why, plaintiff responded, "Because they decided at the end of the meeting that if they erased the write-ups then they could pretend this didn't happen, but at this point I didn't trust them anymore and I just didn't — it wasn't Joyce Honda to me anymore."

After plaintiff rested, the trial judge granted defendant's motion for involuntary dismissal, finding the practices proscribed in N.J.S.A. 10:5-12 "involve conduct by the employer, not conduct by a customer." In addition, the judge found that because she filed a complaint in municipal court, rather than filing a lawsuit or a complaint with the EEOC, plaintiff "has not filed a complaint in any proceeding under [the Law Against Discrimination (LAD)]."

The judge concluded by finding "[t]he case does not stand as against the provision of 10:5-12d" because:

> Plaintiff had a perfect right to complain, to file a police report against [the customer], who obviously acted inappropriately. The defendants had a

perfect right to try to discourage her from doing that because it would be bad with business. There's nothing wrong in them doing that.

However, they made it perfectly clear to her, and she testified that she completely understood that if she wanted to file a complaint she could, and indeed, when she decided that she was ready to file a complaint it was they who called the police so that she could make her complaint in the convenience of the office and in the privacy of the room where [she] was interviewed by the police officer.

The court concluded that "as important as the anti-discrimination law is . . . it simply was not violated in this case" and dismissed the jury. This appeal followed.

We review a motion for involuntary dismissal at trial using the same standard as the trial court. <u>Smith v. Millville Rescue Squad</u>, ___ <u>N.J.</u> ___, ___ (2016) (slip op. at 36-37). <u>Rule</u> 4:37-2(b) provides that after the plaintiff has rested, the defendant

may move for a dismissal of the action or of any claim on the ground that upon the facts and upon the law the plaintiff has shown no right to relief. Whether the action is tried with or without a jury, such motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor.

Thus, "if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and

legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied." Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (quotations omitted). Stated affirmatively, the motion "should be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008).

In order to prove a case for retaliation under the LAD, N.J.S.A. 10:5-1 to -49, a plaintiff must demonstrate: (1) that she "engaged in protected activity"; (2) the activity was "known to the employer"; (3) she suffered "an adverse employment decision"; and (4) there existed "a causal link between the protected activity and the adverse employment action." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 547 (2013) (quoting Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996)).

Our Supreme Court has held that a constructive discharge under the LAD occurs when an employer knowingly permits conditions of discrimination in employment "so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 28 (2002) (quoting Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428 (App. Div. 2001)). The Court has

explained that "the standard envisions a sense of outrageous, coercive and unconscionable requirements." Ibid. (quotation omitted). The heightened standard demanded for proof of a constructive discharge claim recognizes an employee's "obligation to do what is necessary and reasonable in order to remain employed rather than simply quit." Ibid. (internal quotation marks omitted).

The trial court dismissed plaintiff's claims at the close of her proofs because it found she could not make out the first element of her prima facie case, that she had engaged in protected activity. Specifically, the court found plaintiff's complaint to the police to report the workplace incident, in which a customer of her employer tugged down the sleeve of her shirt revealing her bra, was not protected activity under the LAD. Plaintiff and amicus, The National Employment Lawyers Association of New Jersey, Inc., contend the court erred in that finding. We agree.

The Supreme Court has on numerous occasions noted the LAD "is, by its terms, see N.J.S.A. 10:5-3, remedial legislation that was intended to be given a broad and liberal interpretation." Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 259 (2010). Its aim is nothing less than the "eradication 'of the cancer of discrimination.'" Fuchilla v. Layman, 109 N.J.

319, 334 (quoting Jackson v. Concord Co., 54 N.J. 113, 124 (1969)), cert. denied, 488 U.S. 826, 109 S. Ct. 75, 102 L. Ed. 2d 51 (1988).

Because N.J.S.A. 10:5-12d makes unlawful "reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act," and given the "broad and pervasive" scope of the LAD, Craig v. Suburban Cablevision, Inc., 274 N.J. Super. 303, 310 (App. Div. 1994), aff'd, 140 N.J. 623 (1995), and the case law interpreting it, we conclude plaintiff's report to the police of an offensive touching in her workplace by a customer of her employer clearly constitutes protected activity under the Act. See Worth v. Tyer, 276 F.3d 249, 265 (7th Cir. 2001) (holding a plaintiff who reports sexual harassment, in the form of an offensive touching, to the police clearly "opposes" it within the meaning of 42 U.S.C. § 2000e-3(a)). "[T]he broad purposes of the LAD would not be advanced were we to apply so narrow a focus" as to exclude plaintiff from the protections of the Act because she complained to the police instead of to the EEOC. See Battaglia, supra, 214 N.J. at 548.

Resolution of that question of law, however, does not end our inquiry. Although plaintiff contends the only issue on

15                                                    A-3691-14T3

appeal is whether her report to the police constituted protected activity, the question before us is actually whether the trial court's order involuntarily dismissing her lawsuit was appropriately entered.  See Isko v. Planning Bd. of Livingston, 51 N.J. 162, 175 (1968) ("if the order of the lower tribunal is valid, the fact that it was predicated upon an incorrect basis will not stand in the way of its affirmance"), abrogated on other grounds by Commercial Realty & Res. Corp. v. First Atl. Props. Co., 122 N.J. 546 (1991); State v. Maples, 346 N.J. Super. 408, 417 (App. Div. 2002) (an appeal is taken from the court's order rather than reasons for the order).

Plaintiff pursued two claims at trial: retaliation and constructive discharge.[1]  We have no hesitation in concluding plaintiff's claim for constructive discharge was properly

---

[1] Plaintiff and amicus urge us to address whether an employer can be liable under the LAD for maintaining a hostile environment based on the discriminatory acts of its customers.  Because plaintiff specifically abandoned her claim of hostile environment discrimination at trial and proceeded only on claims of retaliation and constructive discharge, it is not appropriate for us to opine on that question or the trial court's views on whether an employer could lawfully attempt to dissuade an employee from filing a police complaint against a valued customer in favor of other efforts to end the conduct. See State v. Robinson, 200 N.J. 1, 19 (2009) ("Appellate review is not limitless.  The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves."); see also Zaman v. Felton, 219 N.J. 199, 226-27 (2014) (same).

dismissed. Plaintiff claimed after she pressed charges, she felt isolated and that people were avoiding her, and she received two written warnings, which she contended were "false" and issued in retaliation for her pressing charges against a valued customer of the dealership. Accepting that as true, no reasonable juror could find that conduct "so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Shepherd, supra, 174 N.J. at 28 (quotation omitted). Her colleagues' coldness and the two attendance warnings simply cannot suffice to prove a constructive discharge under New Jersey law.[2]

---

[2] Our conclusion is not altered by plaintiff's statement to management that her "anxiety was high enough that I was throwing up before work," and the general manager's response that if "the job makes her feel that physically ill, that it would be in her best interest to most likely resign." We do not address whether it was reasonable for plaintiff to become physically ill as a result of the customer's offensive touching. The issue is whether her reaction was an objectively reasonable response — not to the touching — but to the employer's retaliation in the form of her colleagues' coldness and the two warnings to her for attendance violations. Shepherd, supra, 174 N.J. at 25-29 (noting adoption of objective standard for hostile environment claims and that constructive discharge claim requires showing even more egregious conduct); see also Donelson v. DuPont Chambers Works, 206 N.J. 243, 262-63 (2011) (distinguishing between constructive discharge claim under the LAD and lost-wage damages claim under CEPA). Nor was it outrageous for the general manager to advise plaintiff that she should not come to work if doing so made her feel physically ill. To the contrary, it would be wrongful for an employer to force a sick employee to report for duty.

There is, additionally, another reason for dismissal of plaintiff's constructive discharge claim. Plaintiff testified she decided to resign after the meeting with management the day after she received the two written warnings. When her counsel asked her at trial why she made that decision, she explained that the dealership "decided at the end of the meeting that if they erased the write-ups then they could pretend this didn't happen, but at this point I didn't trust them anymore and I just didn't — it wasn't Joyce Honda to me anymore."

The clear import of that testimony is that the dealership, which called the meeting to address plaintiff's concerns over the warnings in an effort "to resolve the issues and move forward," was willing to rescind the warnings and proceed as if they had never been issued. Instead of accepting the dealership's offer to rescind the warnings, plaintiff decided to resign because she "didn't trust them anymore." Because plaintiff had an "obligation to do what is necessary and reasonable in order to remain employed rather than simply quit," ibid., which she clearly did not fulfill, her constructive discharge claim was properly dismissed at trial.[3]

---

[3] Plaintiff contends the trial judge erred in dismissing her case because another judge had denied defendant's prior motion for summary judgment on the basis that plaintiff's allegations could constitute a hostile work environment. We, of course, are not

(continued)

A-3691-14T3

Although whether plaintiff established a prima facie case of retaliation is a closer question, we conclude judgment dismissing that claim was appropriate as well.  Because we find plaintiff's complaint to the police was conduct protected under the LAD, of which the dealership was certainly aware, we are satisfied plaintiff established the first two elements of her prima facie case of retaliation.  See Battaglia, supra, 214 N.J. at 547.

We are also satisfied plaintiff put forth sufficient evidence of a causal link between her police report and the written warnings to establish the fourth element of her prima facie case.  The timing between the two events, specifically that the alleged infraction giving rise to the first warning preceded the police report but the warning was issued after, is likely sufficiently suggestive of retaliatory motive in itself to establish that element.  See Young v. Hobart West Grp., 385 N.J. Super. 448, 467 (App. Div. 2005).  In addition, plaintiff

---

(continued)
bound by interpretative conclusions of the law by either judge. See Nicholas v. Mynster, 213 N.J. 463, 478 (2013).  The prior ruling is, in any event, irrelevant because plaintiff did not pursue a hostile environment claim at trial.  The claims dismissed were for retaliation and constructive discharge. Further, the Supreme Court in Shepherd made clear "a constructive discharge claim requires more egregious conduct than that sufficient for a hostile work environment claim." Ibid.

produced evidence that the general manager had reprimanded her about talking with her co-workers about the incident with the customer.  That evidence also supported a causal link between the complaint and the written warnings.

The question is whether the two written warnings constituted an adverse employment decision, thereby establishing the third element of plaintiff's prima facie case.  As the Court explained in Roa v. Roa, 200 N.J. 555, 575 (2011), the scope of actionable retaliatory conduct under the LAD is broader than the employment-related acts prohibited in N.J.S.A. 10:5-12.  In considering "how harmful an act of retaliatory discrimination must be" in order to be actionable under the LAD, the Court adopted the Title VII standard established by the United States Supreme Court in Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53, 61, 68, 126 S. Ct. 2405, 2411, 2415, 165 L. Ed. 2d 345, 355, 359 (2006).  Roa, supra, 200 N.J. at 575.  The test is whether "'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Ibid. (quoting Burlington Northern, supra, 548 U.S. at 61, 68, 126 S. Ct. at 2411, 2415, 165 L. Ed. 2d at 355, 359) (internal quotations omitted).

In elaborating on the standard, the United States Supreme Court explained "[t]he anti[-]retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington Northern, supra, 548 U.S. at 67, 126 S. Ct. at 2414, 165 L. Ed. 2d at 359 (emphasis added). Further, the Court explained the standard is couched "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." Id. at 69, 126 S. Ct. at 2415, 165 L. Ed. 2d at 360. The Court emphasized that "[c]ontext matters," because "an act that would be immaterial in some situations is material in others." Ibid. (quoting Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)). Accordingly, accepting that the two written warnings constituted retaliation, the question we must answer is whether they produced any "injury or harm" to plaintiff under these circumstances, that is, whether they can be considered materially adverse on the facts plaintiff adduced at trial.

Applying that standard here, we conclude the two written warnings the dealership provided to plaintiff are insufficient to establish she suffered an adverse employment action under the

LAD.[4]  To be clear, we accept that written warnings might, in some circumstances, be materially adverse to an employee — in a formal system of progressive discipline for instance.  We simply cannot find on the facts that these particular warnings posed any harm to plaintiff at all.

First, plaintiff produced absolutely no proof of any tangible injury or harm.  Because she quit her job the day after receiving the warnings, it is impossible to assess their significance for her continued employment, even leaving aside defendant's offer to rescind them and "pretend this didn't happen."  Accordingly, the focus is necessarily on the warnings themselves.

Although plaintiff undoubtedly found the warnings highly distressing, her subjective response to them is not legally significant in assessing whether they were materially adverse.  Justice Breyer in <u>Burlington Northern</u> explained the Court chose an objective standard in requiring a plaintiff to show that a reasonable employee would have found the challenged action, here the warnings, materially adverse, because "[a]n objective

---

[4] Plaintiff also alleges she was shunned by co-workers after she decided to press charges against the customer.  Such petty slights and lack of good manners on the part of co-workers are insufficient to establish an adverse employment action under the LAD.  <u>See</u> <u>Roa</u>, <u>supra</u>, 200 <u>N.J.</u> at 575; <u>Shepherd</u>, <u>supra</u>, 174 <u>N.J.</u> at 25-26.

standard is judicially administrable.  It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."  548 U.S. at 68-69, 126 S. Ct. at 2415, 165 L. Ed. 2d at 360.  Cf. Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 612 (1993) ("An objective reasonableness standard [for judging whether alleged sexual harassment was sufficiently severe or pervasive to alter the conditions of employment] better focuses the court's attention on the nature and legality of the conduct rather than on the reaction of the individual plaintiff, which is more relevant to damages.").

Only one of the warnings referenced repercussions to flow from future infractions, and even that noted only the possibility, not the promise, of time off without pay or termination.  Moreover, plaintiff testified that within twenty-four hours of her receiving them, management was willing "to erase[] the write-ups" and "pretend this didn't happen."  Unlike the defendant's cancellation of plaintiff's health insurance in Roa, which caused plaintiff and his wife "'financial problems, damaged their credit rating, subjected them to constant calls from debt collectors, and caused them a tremendous amount of stress and anxiety,'" 200 N.J. at 575, or Burlington Northern, where the plaintiff suffered a more arduous job assignment and

the financial effects of a thirty-seven-day suspension without pay, even though the suspension was eventually reversed and the plaintiff awarded back pay, 548 U.S. at 71-72, 126 S. Ct. at 2417, 165 L. Ed. 2d at 362, plaintiff can show no discernible injury or harm flowing from these two written warnings.

Because plaintiff could not show she suffered an adverse employment decision, she failed to establish the third element of her prima facie case of retaliation. See Battaglia, supra, 214 N.J. at 547. Her claim was thus properly dismissed at the end of her case under Rule 4:37-2(b).

Accordingly, because the proofs were insufficient to sustain a judgment in plaintiff's favor on her claims of retaliation and constructive discharge, we affirm the involuntary dismissal of her complaint at trial, even though we disagree with the trial court's stated reasons for entry of the order.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION