**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1241-23

MARYJANE PROCTOR,

    Plaintiff-Appellant,

v.

HAYDON CORPORATION,
ADAM WOODS, and
NICOLE C. RUDEL,

    Defendants-Respondents.

_____

        Argued September 10, 2025 – Decided October 23, 2025

        Before Judges Gooden Brown and Rose.

        On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-0524-20.

        R. Armen McOmber argued the cause for appellant (McOmber McOmber & Luber, PC, attorneys; Austin B. Tobin and Christian J. Fechter, of counsel and on the briefs).

        Lance N. Olitt argued the cause for respondents (Kluger Healey, LLC, attorneys; Lance N. Olitt, on the brief).

PER CURIAM

Plaintiff, Maryjane Proctor, appeals from the November 27, 2023 Law Division order granting summary judgment dismissal of her age discrimination and unlawful retaliation complaint against her former employer, defendant Haydon Corporation (Haydon), its President and CEO, defendant Adam Woods, and its Vice President, defendant Nicole Rudel, collectively defendants. Based on the record and applicable legal principles, we affirm.

I.

We glean these facts from the motion record, viewing them in the light most favorable to plaintiff as the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Haydon is a "corporation which manufactures and supplies metal products," specifically for commercial and residential building material. Until 2019, Haydon had manufacturing facilities in New Jersey and Texas. In 2019, the company opened a new manufacturing facility in California. Plaintiff was employed by Haydon from 2006 to July 11, 2019. She was almost sixty-four years old when her employment with Haydon ended.

Initially, plaintiff was a "bookkeeper" and then eventually promoted to "Human Resource Administrator." When plaintiff was promoted to Human Resource Administrator in 2011, she retained her bookkeeping responsibilities

while taking on human resources (HR) responsibilities handled by then-CEO Doug Hillman who left Haydon in 2014. Plaintiff was also given a raise.

As the Human Resource Administrator, plaintiff reported to then-CFO, Raj Kamdar, and Woods. Her "primary function" was to "[e]nsure[] the consistent and effective implementation of policies, procedures, and practices of the Payroll and [HR] functions and timely, effective completion of all tasks related to payroll processing, salary, and benefit administration." Her essential responsibilities included managing payroll; maintaining records of employees' time off; providing "support in the completion of job application materials, benefit enrollment forms, and regulatory employment forms"; advising and assisting employees regarding benefit administration; maintaining company and employee records, particularly regarding work-related accidents; providing "support to management in hiring processes"; maintaining job descriptions and "employee evaluation procedures"; assisting "in the development and implementation of HR policies and procedures"; and receiving "complaints and advis[ing] management of equal opportunity, sexual harassment, racism, or any sort of discrimination."

After Woods became President, Kevin Johnson was hired to replace Kamdar as the CFO. Plaintiff then began reporting to Johnson as her direct

supervisor, as well as to Woods. The company grew over the next eight years, doubling its revenue to about $96 million and increasing the number of employees to about 230. Until January 2019, plaintiff was the only HR employee at Haydon.

At her deposition, plaintiff testified that on October 16, 2018, she was sitting in her office when Johnson "put his head in the door and asked [her] to please meet with him in the conference room." When she arrived, Woods immediately asked her whether she had "any thoughts on retiring." Before plaintiff could reply, Johnson "said something to the effect of, not that we're suggesting you're retiring. . . . We're getting together a succession list or some such thing like that." Woods then asked plaintiff again "about [her] thoughts on retiring," and Johnson again stated, "we're not saying that you should retire." Woods then advised that "when [plaintiff was] ready to retire, six months lead time would be adequate" to train a replacement. Plaintiff described feeling "astounded" and responded that she "had no thoughts . . . [at that point] about retiring." According to plaintiff, this was the sum and substance of their conversation and the "subject of [her] thoughts on retiring [was] [n]ever brought up with [her] again."

4

At his deposition, Woods testified that "[he] had similar conversations with a number of employees." Nevertheless, plaintiff testified that the question posed to her in the October 16, 2018 meeting regarding her retirement plans formed the basis for her "belie[f that] there was a plan to force [her] out of [her] job at Haydon." She stated, "[t]hat was the plan. I don't need to know anything else. They asked me about my retirement plans. I'm [sixty-three] years old. That's all I need to know."

The following month, on November 12, 2018, Woods and Johnson met with plaintiff again and discussed the need to hire "a seasoned HR professional." Plaintiff testified that Woods referred to the planned new hire as an "HR manager." However, Woods testified at his deposition that he and Patricia Wagstaff, Chairperson of the Board of Directors, had determined that "the company needed an HR [D]irector." As a result, the two had "developed a job description and title" for the position.

At the November 12, 2018 meeting, Woods handed plaintiff a sheet of paper that contained the job description for the new position. Plaintiff testified that after reviewing the job listing, she asked Woods, "now that we are getting

5

a new person in the department, am I going to be doing the step and fetch,[1] and the new person doing the more interesting items?"  Woods responded that the hiring would not affect plaintiff's tasks.

Plaintiff acknowledged during her deposition that none of the tasks that were listed for the new position were hers and "the scope of work was different than what [she] handled."  Plaintiff added that Woods explained "[t]he company [wa]s growing . . . . and as a result of this [they] need[ed] professional people."  Nonetheless, because plaintiff believed the person they were hiring would be taking her job, she asked, "[w]here does this leave me?"  Since "Woods had just asked [her] the month before about [her] retirement plans," plaintiff believed "[they] were already on the path" to terminating her and was "skeptical" about Woods's assurances in responding to her question.  Plaintiff claimed she advised defendants at the meeting that "she felt . . . marginalized by [d]efendants because she was an older employee," but that her "complaints . . . fell on deaf ears."

The following day, Woods sent an email to plaintiff, with a copy to Johnson, "following up on the discussion . . . [the prior] afternoon during which [he] informed [plaintiff] of the [c]ompany's intention to create the new position

---

[1]  Plaintiff explained that "[s]tep and fetch, in [her] mind, would be lower level tasks."

6

of HR Manager."  The email reiterated that the "decision was based on the growing HR needs of the organization."  The email also stated, "I have taken note of your concerns about being relegated to less challenging tasks and I will make certain to include and involve you in as many challenging tasks and projects as possible.  Should you have any questions or concerns, please ask [Johnson] or myself."

Wagstaff eventually posted the HR Director position on an online advertising platform.  The job posting listed a bachelor's degree and master's degree, with "[a]t least one in Human Resources," as preferred qualifications.  Woods testified that the intent was to hire an HR Director "[t]o have oversight and ownership for hiring, promotions, performance evaluations, recruitment, retention, compensation, all . . . dealings with . . . [the] union, . . . . [and m]aking sure that [Haydon's] policies and procedures and manuals . . . meet[] the needs of the company."  The HR Director would also be involved with "employee training," "compliance" with state laws, and "the insurance renewal process."

On December 3, 2018, plaintiff's formal job description changed from "Human Resource Administrator" to "Human Resource Manager."  There was no change in pay or responsibilities associated with the title change.  Woods testified that he approved the change in plaintiff's title because she "was

7

spending more of her time on matters of human resources and less[] time involved with accounting payroll and finance." Woods explained that although he "consider[ed]" plaintiff for the position of HR Director, he determined she was not qualified for the position because of "[h]er lack of experience relative to the qualities and experience that [they] were looking for" and "[h]er lack of a secondary degree specific to human resources." He testified that plaintiff did not ask to be considered for the role and plaintiff similarly testified that she never expressed interest in or applied for the position.

Plaintiff was "invited to join in the interview process when they were down to the final contestants" for the HR Director position. She attended interviews and shared her experience at Haydon with the candidates. After the interviews, she expressed her opinion about the candidates' qualifications if asked. In January 2019, Haydon hired Sid Awad, then-forty-five years old, for the position of HR Director. Plaintiff reported to Awad for HR functions and continued to report to Johnson for accounting functions. Plaintiff confirmed that after Awad was hired, her "job responsibilities did not diminish." She also testified that she did not receive "added tasks as a result of age discrimination."

The following month, on February 27, 2019, plaintiff received her 2018 annual review prepared by Johnson. The review was generally positive but included some critiques, stating in pertinent part:

> I acknowledge your work on the C[alifornia] setup [and] ADP code restructuring. However, I would like to see more initiative on utilizing ADP as a[n] HRIS tool to streamline financial processes. Also the beginning of utilization of Excel/spreadsheets . . . .
>
>    . . . .
>
> I agree that you are well organized but I would like to see record retrieval more efficient going forward utilizing electronic formatting where possible.
>
>    . . . .
>
> You possess the required job skills. I would like to see more initiative in other areas such as utilization of Synergy and prevention of duplicate[s] . . . .
>
>    . . . .
>
> I acknowledge your good attendance record. However, as a manager you are expected to lead by example and promptness is an essential behavior that a manager needs to display.
>
>    . . . .
>
> I agree that you were helpful on the situation of the shop steward . . . . More creativity in the development of ideas that could help efficiency or reduce errors would be helpful.

9

> . . . .

> I agree . . . [t]he employees feel comfortable with you. Would like to see better communication between you [and] T[exas and] C[alifornia] locations.

Plaintiff received an overall score of 90 out of 100.

About two months later, on April 17, 2019, plaintiff met with Woods, Johnson, and Awad regarding "various mistakes" she had made on the job. Plaintiff testified that at the start of the meeting, Woods, Johnson, and Awad attempted to hand her a written "warning notice," documenting the mistakes, but she refused to accept it. She explained she refused to accept the notice "[b]ecause [she] wasn't going to be a party . . . . in [her] own execution." After a brief discussion lasting approximately ten minutes regarding the mistakes listed in the written notice, plaintiff concluded the meeting because she "had a splitting headache and needed to go home."

Awad sent plaintiff the notice by email later that day, memorializing their discussion as follows:

> You were asked to meet with Adam Woods, Kevin Johnson and myself in [Woods's] office to address your work performance. Kevin Johnson started the meeting by addressing seven . . . recent performance issues that are subpar. After[, y]ou were given an opportunity to respond to [Johnson's] concerns. You stated that the concern[s] were "well thought out and researched" and [that you] have a splitting headache and must go home.

Attached is the official write-up which will be placed in your employee record.

We sincerely hope that you understand that we are concerned about your level of performance and the number of critical errors that have recently taken place. We look forward to working with you on resolving these issues.

Attached to the email was the written notice documenting seven "mistakes." Although some of the mistakes occurred in 2018, they were not discovered until 2019, after plaintiff's 2018 annual review, and had elicited concern from Haydon's Board of Directors. Specifically, the notice indicated that: (1) plaintiff was tasked with "search[ing] out all levels of C[alifornia] government to identify state, county and local registration requirements," and although she advised Johnson that "all was in place and being worked on," the company was "subject to penalties and state sales tax audit for non-compliance"; (2) plaintiff issued checks to the wrong payee; (3) plaintiff issued 1099 forms to a Haydon owner and listed the incorrect social security number on an employee's 1099 form; (4) plaintiff issued a check to a vendor in the amount of $128,000 instead of $50,000; (5) plaintiff issued a check to a subcontractor in the amount of $40,000 instead of $4,000; (6) plaintiff paid the same invoice three times; and (7) plaintiff was late for work despite being warned about her tardiness in her annual review.

Plaintiff testified that after leaving work following the meeting, she spoke with an attorney who assisted her in preparing an email addressed to Woods, Johnson, and Awad, alleging "illegal treatment and discrimination [she was] being subjected to at Haydon [Corporation] on the basis of [her] age." In the email, which was sent the same evening, to support her discrimination claim, plaintiff identified a series of incidents that had occurred after she was asked about retiring in the meeting with Woods and Johnson. The incidents included the hiring of Awad as the HR Director and the issuance of the written warning notice. Plaintiff testified that after the meeting, she did not return to work until the following week.

When plaintiff was questioned at her deposition about her role in each mistake listed on the written warning notice, she reluctantly admitted she was responsible, at least in part, for a few of the "mistakes" but blamed other employees as well as Haydon's software for the bulk of the mistakes. She explained:

> There were many parties that had a hand in these mistakes. However, I was the only one that was called onto the carpet about these mistakes and I said as such. I said this at this meeting.
>
> Interestingly, I said . . . that I'm the only one being blamed and there [are] other persons involved in these mistakes. And interestingly, [S]yd Awad said to

12

the group, to [Woods], to . . . Johnson and to me, he said, well, she has a point there, meaning, that there's others involved in these mistakes and I am the one being singled out.

. . . .

Mistakes happen. They happen all of the time. Everyone makes mistakes. I make mistakes. They make mistakes. Everyone makes mistakes, yes.

Later in April 2019, Awad was terminated due to inappropriate conduct with a co-worker. Haydon hired Rudel, then-fifty-one years old, in June 2019 as his replacement.[2] Once again, during the hiring process, plaintiff did not apply for the HR Director position and did not express an interest in the position. Plaintiff also testified that Rudel's hiring did not "diminish [her] responsibilities."

On July 11, 2019, Rudel asked plaintiff to join her in Woods's office for a meeting. Woods and Johnson were present with Rudel and plaintiff. According to plaintiff, at the meeting, Rudel discussed plaintiff's "performance issues[ and] lack of improvement" and stated, "we need an improvement plan." Plaintiff specifically recalled Rudel offering plaintiff assistance with "ad hoc requests."

---

[2] Rudel was elevated to Vice President in June 2021.

Plaintiff responded "that the solution for addressing how busy [she had been] . . . was to reassign some of the work from [her] desk to someone else."

Plaintiff testified that Rudel attempted to hand her another written warning notice but she "wasn't going to accept their warning notice." Plaintiff said she "didn't want to look at it," "sign it," or "touch it." She "wanted nothing to do with it." Plaintiff testified that she

> told them that [she] wanted the warning notice thrown in the garbage, discarded, otherwise disposed of. And [she] said if that wasn't done then today will be [her] last day. And when the discussion continued . . . along the same v[e]in, that's when [she] stood up, and . . . said, "think about what you want to do and let me know. I'm going to go back to my office.["]
>
> [(Emphasis added).]

Plaintiff went back to her office and resumed working. About five to ten minutes later, Rudel came to her office and asked her to return to the meeting. When plaintiff returned, Woods asked her whether she was "going to quit or resign" if they did not "tear up the warning notice today." Plaintiff responded that she "did not say that." Instead, she "said that [she] wanted the warning notice thrown away or today would be [her] last day." According to plaintiff, Woods then instructed her to "collect [her] things and leave the building." Plaintiff understood Woods's instruction to mean that she was "fired." She

14

testified that before leaving, she shook hands with the three of them and wished them all well.

Rudel testified at her deposition that plaintiff "didn't allow [them] to complete [the] discussion with her," as she "was unwilling to engage in any dialogue" about how they could "support her," or what they "could do to put into place [things] that might mitigate or prevent these things from happening in the future." The written warning notice, which was prepared by Rudel, stated that plaintiff was counseled in April 2019 "on the importance of accuracy, ensuring appropriate controls are in place[,] and attention to detail." It described two additional "incidents that demonstrate[d] that [plaintiff was] not improving in these areas." In the notice, Rudel stated, she believed plaintiff could "make the required changes to improve [her] performance" and indicated that she was "available to support [plaintiff] in any way" she could. The notice detailed a "Plan for Improvement" and the section entitled "Consequences of Further Infractions" was left blank.

July 11, 2019, was plaintiff's last day working at Haydon. In a July 23, 2019 letter to plaintiff, Rudel recounted the July 11, 2019 meeting, stating that "[t]he objective of the meeting was to discuss the most recent issues, determine the underlying cause[,] and agree on an action plan to correct these issues."

15

However, after reviewing the errors, plaintiff stated that she "would resign immediately if the written warning was not destroyed." The letter further stated that after taking a break, plaintiff "confirmed [her] intent to resign immediately if [they] proceeded with the written warning." As a result, they "accepted [plaintiff's] verbal resignation." The letter also provided that plaintiff would be "paid out for unused accrued vacation" consistent with the company's policies.

On February 13, 2020, plaintiff filed a complaint against Haydon, Woods, and Rudel alleging: (1) age discrimination, in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49 (count one); (2) "retaliation/improper reprisal" in violation of the LAD, N.J.S.A. 10:5-12(d) (count two); and (3) Wage Theft Act (WTA) violations, N.J.S.A. 34:11-4.10(c) (count three). In the complaint, plaintiff alleged that defendants violated the LAD by discriminating against her based on her age and retaliating against her by "subject[ing her] to excessive discipline, workplace harassment, and adverse employment actions" for "having asserted her rights under the LAD by complaining to [d]efendants about age discrimination and retaliation she experienced while employed by [d]efendants." Among other things, plaintiff sought compensatory and punitive damages.

16

Following the completion of discovery, defendants moved for summary judgment. On November 27, 2023, after hearing argument, the motion judge issued an order with accompanying statement of reasons granting defendants' motion and dismissing plaintiff's complaint with prejudice. In the statement of reasons, after reciting the facts and reviewing the applicable legal principles, the judge determined that both of plaintiff's LAD claims "fail[ed] as a matter of law" due to her failure "to establish a prima facie case."

The judge explained that both claims required a showing that plaintiff "suffered an adverse employment action" but "[t]he record evidence, most notably her own deposition testimony, confirm[ed] that [plaintiff could not] make that showing." The judge also noted that although there was "no allegation of constructive discharge, even if there was, such a claim could not survive summary judgment" based on "the undisputed facts of th[e] case." In support, the judge pointed out that "[p]laintiff resigned from her position and refused to participate in . . . [d]efendants' corrective action plan." The judge found plaintiff's unequivocal statement "that if the [n]otice was not torn up or withdrawn, it would be her last day" could only be interpreted as "a resignation, effective immediately."

The judge continued that even assuming "there was an adverse employment action," plaintiff failed to "establish that the reasons for . . . [d]efendants['] actions were a pretext for discrimination." The judge expounded:

> There were valid reasons for the April Notice and July Notice, and [p]laintiff's own deposition testimony supports that. She acknowledged all of the deficiencies as being factual. It appears that [p]laintiff's entire case for age discrimination is based upon a single conversation at an October 16, 2018 meeting that she had with Woods and Johnson, when Woods asked [p]laintiff, "do you have any thoughts on retiring?" It was explained to her at that meeting that Haydon was looking at succession planning, made clear that no one was suggesting that she should retire, and explained that the nature of her job and the critical functions she served would require about six months lead time to train a replacement if and when she chose to retire.

Lastly, the judge concluded there was "no legal basis for imposing liquidated damages or any other damages award under [p]laintiff's WTA claim," as there was no evidence that "the pay shortfall [was] anything but an inadvertent error." The judge explained that plaintiff never informed defendants of the error prior to filing her complaint, and plaintiff had since "received payment of all wages owed to [her]." Accordingly, the judge determined that the WTA claim "should be dismissed." This appeal followed.

18

On appeal, plaintiff argues summary judgment was inappropriate because there existed "genuine issues of material facts" as to whether plaintiff established the prima facie elements of her age discrimination and retaliation claims. She contends the judge erred by making "several determinations of credibility" that are reserved for a jury. As to her WTA claim, plaintiff asserts that although defendants "ultimately" paid "the amount owed," she "is still entitled to attorney's fees and costs related to her [WTA] cause of action as a matter of law" because defendants "failed to pay [her] for forty-four . . . hours of unused vacation time" within "the required time limit" under N.J.S.A. 34:11-4.10(c).

## II.

Our analysis begins with some established principles regarding our standard of review. "[W]e review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. R. 4:46-2(c); see Brill, 142 N.J. at 540. On

the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted. R. 4:46-2(c); see Brill, 142 N.J. at 540.

[Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016) (citations reformatted).]

"While 'genuine' issues of material fact preclude the granting of summary judgment, R. 4:46-2, those that are 'of an insubstantial nature' do not." Brill, 142 N.J. at 530 (quoting Judson v. Peoples Bank & Trust Co., 17 N.J. 67, 75 (1954)). Where there is no genuine issue of material fact in dispute, "we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007), overruled on other grounds by, Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558 (2012)). "We review issues of law de novo and accord no deference to the trial judge's [legal] conclusions . . . ." MTK Food Servs., Inc. v. Sirius Am. Ins. Co., 455 N.J. Super. 307, 312 (App. Div. 2018).

"[T]he evaluation of every motion for summary judgment requires the court, trial or appellate, to review the motion record against not only the elements of the cause of action but also the evidential standard governing that cause of action." Bhagat v. Bhagat, 217 N.J. 22, 40 (2014). Stated differently,

20

"summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  We therefore turn to an examination of the essential elements of plaintiff's LAD and WTA claims.

The LAD makes it "an unlawful employment practice" or "unlawful discrimination" for

> an employer, because of the . . . age . . . of any individual . . . to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .
>
> [N.J.S.A. 10:5-12(a).]

It is equally unlawful

> [f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has sought legal advice regarding rights under this act, shared relevant information with legal counsel, shared information with a governmental entity, or filed a complaint, testified or assisted in any proceeding under this act . . . .
>
> [N.J.S.A. 10:5-12(d).]

21

It is also unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."  N.J.S.A. 10:5-12(e).

Because "the overarching goal of [the] LAD [is] to eliminate the cancer of discrimination," Viscik v. Fowler Equip. Co., 173 N.J. 1, 13 (2002), "the LAD should be construed liberally to achieve its aims."  Zive v. Stanley Roberts, Inc., 182 N.J. 436, 446 (2005).  See Richter v. Oakland Bd. of Educ., 246 N.J. 507, 537 (2021) ("[T]he LAD is given liberal construction, for the 'more broadly [the LAD] is applied, the greater its antidiscriminatory impact.'" (second alteration in original) (quoting Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 115 (2010))).

Our courts utilize the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to evaluate LAD claims, requiring plaintiffs to first establish a prima facie case of discrimination.  Viscik, 173 N.J. at 13-14.  To establish a prima facie case of age discrimination, a plaintiff asserting a claim of discriminatory discharge "must demonstrate that:  (1) she belongs to a protected class; (2) she performed her job at a level that satisfied [the company's] legitimate expectations; (3) she was discharged; and (4) she was replaced by 'a candidate sufficiently younger to permit an inference of age

22

discrimination.'" Young v. Hobart W. Grp., 385 N.J. Super. 448, 458 (App. Div. 2005) (quoting Bergen Com. Bank v. Sisler, 157 N.J. 188, 210-13 (1999)).

> On the other hand, the prima facie elements of a retaliation claim under the LAD requires plaintiff to demonstrate that: (1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence.
>
> [Victor v. State, 203 N.J. 383, 409 (2010) (citing Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996)).]

"[A]s a prerequisite for proceeding on a retaliatory claim, a plaintiff must also bear the burden of proving that he or she had a good faith, reasonable basis" for engaging in the protected activity. Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 125 (2008) (citing Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 373 (2007)).

In articulating a standard for actionable adverse employment consequences, in Roa v. Roa, 200 N.J. 555 (2010), our Supreme Court

> adopted the Title VII standard established by the United States Supreme Court in Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53, 61, 68 (2006). Roa, 200 N.J. at 575. The test is whether "'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making

23

or supporting a charge of discrimination.'" Ibid. (quoting Burlington N., 548 U.S. at 61, 68) (internal quotations omitted).

In elaborating on the standard, the United States Supreme Court explained "[t]he anti[-]retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N., 548 U.S. at 67. Further, the Court explained the standard is couched "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." Id. at 69. The Court emphasized that "[c]ontext matters," because "an act that would be immaterial in some situations is material in others." Ibid. (quoting Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)).

[Prager v. Joyce Honda, Inc., 447 N.J. Super. 124, 139-140 (App. Div. 2016) (citations reformatted).]

As such, "petty slights and lack of good manners on the part of co-workers are insufficient to establish an adverse employment action under the LAD." Id. at 140 n.4. Similarly, an employer's filing of two written warnings in the absence of "discernible injury or harm flowing from the[] two written warnings" is insufficient to be considered adverse employment actions to form the basis for a LAD retaliation claim. Id. at 141.

Still, "[t]he evidentiary burden at the prima facie stage is 'rather modest'" and "is to be evaluated solely on the basis of the evidence presented by the plaintiff, irrespective of defendants' efforts to dispute that evidence." Zive, 182

24

N.J. at 447-48 (italicization omitted) (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)).  Indeed, "[t]he establishment of a prima facie case gives rise to a presumption of discrimination."  Viscik, 173 N.J. at 14 (italicization omitted).

If a plaintiff demonstrates a prima facie claim, the burden of going forward, but not the burden of persuasion, "shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action."  Ibid. If the employer articulates a legitimate reason for its action, "the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination."  Ibid.  To prove pretext, a plaintiff must show the proffered reason was false, and "the employer was motivated by discriminatory intent."  Ibid.

> Indeed, overcoming the pretext burden
>
> > requires more of a plaintiff than simple identification of an act or event that the plaintiff believes bespeaks discrimination.  As our Supreme Court has held, "[t]o prove pretext, . . . a plaintiff must do more than simply show that the employer's [proffered legitimate, non-discriminatory] reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent."
> >
> > [El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 173 (App. Div. 2005) (alterations in original) (quoting Viscik, 173 N.J. at 14).]

25

"Plaintiff's burden on the pretext part of the analysis . . . is not insignificant." Id. at 174.

"If the employer is unable to proffer a nondiscriminatory reason, plaintiff is entitled to summary judgment . . . ." Marzano, 91 F.3d at 508. "[I]f the employer proffers a reason and the plaintiff can produce enough evidence to enable a reasonable factfinder to conclude that the proffered reason is false, plaintiff has earned the right to present his or her case to the jury." Ibid. However, a

> plaintiff does not qualify for a jury trial unless he or she can "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."
>
> [Zive, 182 N.J. at 455-56 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).]

"Thus, under the McDonnell Douglas framework, a plaintiff retains the ultimate burden of persuasion at all times; only the burden of production shifts." Viscik, 173 N.J. at 14.

"[A] constructive discharge claim under the LAD accrues when the employee gives notice of . . . resignation or retirement." Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 27 (2002). A constructive discharge claim bears "subtle

but discernable differences" from a hostile work environment claim.  Id. at 28.

"The hostile work environment claim requires 'severe or pervasive' conduct that objectively 'alters the conditions of employment' and is 'hostile or abusive.'" Ibid.  By contrast, a constructive discharge claim has a higher standard and requires "not merely 'severe or pervasive' conduct, but conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it."  Ibid. (citing Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428 (App. Div. 2001)).  "More precisely, the standard envisions a 'sense of outrageous, coercive and unconscionable requirements'" that are "more egregious conduct than that sufficient for a hostile work environment claim." Ibid. (quoting Jones, 339 N.J. Super. at 428).

In Shepherd, our Supreme Court observed:

> Generally, a constructive discharge under the LAD occurs when an "employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Muench v. Twp. of Haddon, 255 N.J. Super. 288, 302 (App. Div. 1992) (quoting Goss v. Exxon Off. Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984)). In addition, specific considerations are relevant to a constructive discharge analysis.  In particular,
>
> > an employee has the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit. A trial court should consider the nature of

> the harassment, the closeness of the
> working relationship between the harasser
> and the victim, whether the employee
> resorted to internal grievance procedures,
> the responsiveness of the employer to the
> employee's complaints, and all other
> relevant circumstances.
>
> [Shepherd, 174 N.J. at 27-28 (alteration in original)
> (citation reformatted) (internal quotation marks
> omitted) (quoting Shepherd v. Hunterdon Dev. Ctr.,
> 336 N.J. Super. 395, 420 (App. Div. 2001), rev'd in part
> on other grounds, 174 N.J. 1 (2002)).]

Regarding the WTA cause of action, the New Jersey Wage Theft Act, L. 2019, c. 212, enacted in August 2019, "confers upon an aggrieved employee" the right to

> recover in a civil action the full amount of any wages
> due, or any wages lost because of retaliatory action
> taken in violation of [N.J.S.A. 34:11-4.10(a)], . . . plus
> an amount of liquidated damages equal to not more than
> 200 percent of the wages lost or of the wages due,
> together with costs and reasonable attorney's fees.
>
> [Musker v. Suuchi, 479 N.J. Super. 38, 43-44 (App.
> Div. 2024) (alteration in original) (quoting Maia v.
> IEW Constr. Grp., 475 N.J. Super. 44, 50-51 (App. Div.
> 2023), rev'd on other grounds, 257 N.J. 330 (2024)).]

The WTA also provides that

> [t]he payment of liquidated damages shall not be
> required for a first violation by an employer if the
> employer shows to the satisfaction of the court that the
> act or omission constituting the violation was an

inadvertent error made in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation, and that the employer acknowledges that the employer violated the law and pays the amount owed within [thirty] days of notice of the violation.

[N.J.S.A. 34:11-4.10(c).]

Applying these principles, we agree with the judge that summary judgment dismissal of plaintiff's complaint was warranted. Regarding the LAD claims, plaintiff failed to demonstrate that she was discharged or suffered adverse employment consequences to establish a prima facie case of discriminatory discharge or retaliation based on her age. There is simply no competent evidence in the record to support plaintiff's claim that she "suffered multiple instances" of adverse employment actions, culminating in her "constructive termination on July 11, 2019." Even if we consider plaintiff's claim of constructive discharge which was never pled, we agree with the judge that plaintiff failed to meet the requisite standard. Viewing the facts in the light most favorable to plaintiff, plaintiff has not demonstrated "'conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" Shepherd, 174 N.J. at 27 (quoting Muench, 255 N.J. Super. at 302).

Plaintiff asserts the "disparate treatment," failure to "investigate" her age discrimination complaints, "diminution of [her] job responsibilities" by transferring the rewarding responsibilities to younger employees, "intentional overburdening with excessive, time-sensitive" assignments after she indicated she had no plans to retire, "bypassing [her] for promotions," and issuance of "pretextual warning notices" with outdated performance issues "in retaliation for her [discrimination] complaints" give rise to an inference of discrimination and amount to "adverse employment actions" which culminated in her constructive discharge on July 11, 2019. However, plaintiff's claims of adverse employment actions are belied by her own deposition testimony.

Plaintiff conceded at her deposition that she did not apply for the promotion when the HR Director role was first created, and she did not apply for the position when Awad was terminated. Critically, she offered no evidence that Woods, Johnson, or anyone at Haydon prevented her from applying for the position. Further, plaintiff admitted that when she was asked about her retirement plans, she was told it was for succession planning purposes and assured that she was not being asked to retire. Plaintiff did not dispute that others were similarly questioned about their retirement plans and admitted the October 2018 meeting was the only time defendants asked her about potential

 A-1241-23

retirement.  Plaintiff also conceded at her deposition that when Awad and Rudel were each hired, her tasks did not "diminish" but remained the same.  She also admitted she was not given added tasks due to age discrimination.  Additionally, when she complained that she felt marginalized because of her age, Woods pledged to involve her in more challenging projects.  Thereafter, Woods authorized a change in plaintiff's job description from HR Administrator to HR Manager.

Similarly, plaintiff's argument that the two written warning notices constituted adverse employment actions is not supported by the undisputed facts in the record.  Plaintiff produced no competent evidence of tangible injury or harm because defendants offered to support and work with plaintiff in resolving the issues.  The July warning expressed a belief in plaintiff's ability to make the necessary corrective steps and neither warning constituted a final warning.  "Although plaintiff undoubtedly found the warnings highly distressing, her subjective response to them is not legally significant in assessing whether they were materially adverse."  Prager, 447 N.J. Super. at 140.

> Unlike the defendant's cancellation of [the] plaintiff's health insurance in Roa, which caused [the] plaintiff and his wife "'financial problems, damaged their credit rating, subjected them to constant calls from debt collectors, and caused them a tremendous amount of stress and anxiety,'" 200 N.J. at 575, or Burlington

> Northern, where the plaintiff suffered a more arduous job assignment and the financial effects of a thirty-seven-day suspension without pay, even though the suspension was eventually reversed and the plaintiff awarded back pay, 548 U.S. at 71-72, [the] plaintiff can show no discernible injury or harm flowing from these two written warnings.
>
> [Prager, 447 N.J. Super. at 141.]

Cf. El-Sioufi, 382 N.J. Super. at 169-170 (explaining that "an unfavorable evaluation, unaccompanied by a demotion or similar action," is insufficient to rise to the level of an adverse employment action).

Plaintiff's assertion that the two written warning notices were "pretextual" is likewise unavailing. Although she asserts that her 2018 annual evaluation did not discuss any issues later mentioned in the warning notices, the annual evaluation commented on her tardiness at work and recommended that she improve her communication and efficiency as well as limit errors in her work. Critically, although plaintiff attempted to deflect responsibility for the errors delineated in the notices, she acknowledged that mistakes were made and some were made by her.

Regarding the WTA claim, as the judge explained, the pay shortfall was clearly an inadvertent error. Plaintiff conceded at her deposition that she never informed Haydon that she believed she was still owed any additional pay and

never sought to correct the error prior to filing her complaint. Once aware, Haydon promptly resolved the issue by paying plaintiff her unpaid vacation time. Therefore, we agree with the judge that dismissal of the WTA claim was warranted.

In summary, because plaintiff's claims failed, the judge correctly granted summary judgment in favor of defendants and dismissed plaintiff's complaint with prejudice.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

 A-1241-23