**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0129-23

SECOND INNING 1, LLC,

    Plaintiff-Appellant/Cross-
    Respondent,

v.

RELAP LLC, ESTATE OF
MARCEL Z. ANTAKI,
ESTATE OF LILIANE ANTAKI,
ALAN ANTAKI, ROGER
ANTAKI, and NICHOLAS
ANTAKI,

    Defendants-Respondents/
    Cross-Appellants.

_____

Argued November 10, 2025 – Decided December 4, 2025

Before Judges Sabatino, Walcott-Henderson and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. C-000094-18.

Andrew J. Kyreakakis argued the cause for appellant/cross-respondent (Weiner Law Group LLP, attorneys; Andrew J. Kyreakakis, on the briefs).

Matthew P. Dolan argued the cause for respondents/cross-appellants RELAP LLC, Estate of Liliane Antaki, Alan Antaki, Roger Antaki, and Nicholas Antaki (Meyner and Landis LLP, attorneys; Matthew P. Dolan, on the briefs).

Charles M. Kennedy argued the cause for respondent/cross-appellant Estate of Marcel Z. Antaki (Baldassare & Mara, LLC, attorneys; Michael Baldassare, Jennifer Mara, and Charles M. Kennedy, on the briefs).

PER CURIAM

This commercial lease dispute was tried intermittently over three months in 2022 as a non-jury case in the Chancery Division. The parties to that dispute are the commercial tenant, plaintiff Second Inning 1, LLC ("Second Inning"), an adult day-care center, and the landlord, defendant RELAP, LLC ("RELAP"), as well as several codefendant individuals associated with RELAP.[1]

---

[1] The codefendants are Alan Antaki, Roger Antaki, Nicholas Antaki, the Estate of Marcel Z. Antaki, and the Estate of Liliane Antaki. Because these related individuals share the same surname, we will refer to them by their first names, intending no disrespect.

Second Inning sued defendants for breach of contract along with other legal theories. Defendants contested their liability and moved for summary judgment, which a pretrial judge[2] denied except as to defendant Nicholas.

At the conclusion of the lengthy bench trial, the trial judge issued a written opinion rejecting Second Inning's claims. The judge thereafter awarded partial fee-shifting sanctions in favor of two of the individual co-defendants, Nicholas and Liliane's estate, pursuant to the frivolous litigation statute, N.J.S.A. 2A:15-59.1.

Second Inning appeals the trial court's rejection of its claims on the merits and the fee-shifting sanctions. Defendants, meanwhile, cross-appeal the pretrial judge's denial of summary judgment to them.

For the reasons that follow, we affirm the trial judge's disposition of the merits, substantially for the sound reasons expressed in its written opinion dated November 15, 2022. However, we reverse the award of sanctions.

Lastly, we reject the cross-appeal because, given the posture of the case on summary judgment as presented to the pretrial judge, there were sufficient legal issues and genuine material questions of fact to justify a trial.

---

[2] A different judge tried the case, who we will refer to as the trial judge.

 A-0129-23

I.

The parties are undoubtedly very familiar with the factual background and procedural history of this protracted litigation, and we need not elaborate upon it here. The following summary of key events and the most relevant lease provisions will suffice.

In 2008 Second Inning entered into a lease for space in RELAP's commercial property in Whippany. There were three amendments to the lease over the relevant years in 2010, 2013 and 2016 to extend the lease term and accommodate an expansion of plaintiff's "adult day care" business. Two other tenants occupied the building.

This litigation arose fundamentally from a dispute over parking spaces that Second Inning could use on the premises. According to the initial lease, Second Inning was responsible for obtaining the necessary land use approvals for parking spaces on site. Overnight parking was necessary for Second Inning's business, as it utilized its own vehicles to transport elderly residents to and from their homes, medical appointments, shopping, and other activities.

Second Inning initially needed 14 parking spaces, which was increased to 16 at the time of the second lease amendment. In the third lease amendment, Second Inning specified it needed 44 spaces.

A-0129-23

Several key provisions in the first lease were highlighted by the trial judge and are pivotal to the analysis. The lease[3] stated in part:

> The Tenant shall diligently pursue, at its sole cost and expense, all necessary approvals and permits from the Township of Whippany, New Jersey including, but not limited to any necessary Whippany zoning approvals, construction permits, and approval of the New Jersey State Division of Health and Human Services, and from any other governmental instrumentality, board or bureau having jurisdiction thereof necessary for the Tenant to utilize the Demised Premises for the Permitted Use. In the event that the Tenant fails to obtain such approval and permits aforesaid within 90 days of the date of this Lease, the Landlord may, in its sole discretion, declare this Lease null and void.
>
> [(Emphasis added).]

Section 1 of the first lease also provided in part:

> Tenant acknowledges that it is familiar with the Demised Premises and hereby agrees to accept the Demised Premises in its present condition, AS IS, including, but not limited to, the major systems being in good working order and the structure of the Demised Premises being in good and sound conditions, except for work to be performed by Tenant, at Tenant's sole cost and expense, in accordance with Exhibit "B" attached hereto and made a part hereof (hereinafter "Tenant's Work Letter"). . . . Tenant agrees to be solely responsible for obtaining all necessary governmental approvals and all costs related thereto in connection with Tenant's Work Letter. . . . Tenant further acknowledges that neither Landlord nor anyone on Landlord's behalf has made any representations or

---

[3] For context, all references in the leases to "Tenant" refer to plaintiff Second Inning and all references to "the Landlord" refer to defendant RELAP.

A-0129-23

warranties with respect to the condition of the Demised Premises.

[(Emphasis added).]

Exhibit B to the first lease, entitled "Tenant's Work Letter," outlined various requirements to ensure that Second Inning's contractors carried insurance to cover any claims arising from the anticipated construction. The lease included a non-liability provision in section 7(a), which provided in relevant part that "[n]either the Landlord nor any partner of the Landlord shall be under any personal liability to the Tenant with respect to any provision of this Lease."

Moreover, in section 37, the first lease included a non-waiver provision, which stated:

> The various rights, remedies, options and elections of the Landlord, expressed herein, are cumulative, the failure of the Landlord to enforce strict performance by the Tenant of the conditions and covenants of this Lease or to exercise any election or option, or to resort or have recourse to any remedy herein conferred or the acceptance by the Landlord of any installment of Rent and Operating Charges after any breach by the Tenant, in any one or more instances, shall not be construed or deemed to be a waiver or a relinquishment for the future by the Landlord of any such conditions and covenants, options, elections or remedies, but the same shall continue in full force and effect.

[(Emphasis added).]

A-0129-23

Of particular importance to the parties' ensuing course of conduct and interactions, section 41 of the first lease contained "entire agreement" language (sometimes known as an "integration clause"), which stated in pertinent part:

> This Lease contains the entire agreement between the parties. No representative, agent or employee of the Landlord has been authorized to make any representations or promises with reference to the within letting or to vary, alter or modify the terms thereof. No additions, changes or modifications, renewals or extensions hereof shall be binding <u>unless reduced to writing and signed by the Landlord and the Tenant</u>.
>
> [(Emphasis added).]

The first lease also provided for Second Inning's use of 14 parking spaces, as specified in the building plan included in Exhibit A of the lease addendum. Before signing the first lease, Second Inning submitted an application to the Township of Hanover Site Plan Exemption Committee to use the premises as an adult day care center. Evidently that application was approved.

On August 1, 2010, the parties entered the first lease amendment, which extended the lease an additional five years. Notably the amendment provided that, "[e]xcept as expressly provided herein, all other terms, conditions, covenants, conditions and agreements as set forth in the Lease remain unchanged and in full force and effect." Marcel signed as "Managing Member" on behalf of RELAP.

The parties entered a second lease amendment on May 23, 2013, increasing the leased premises from 6,150 square feet to 7,200 square feet, and Second Inning's common area maintenance ("CAM") share to 32%. The lease amendment also increased the parking spaces allotted to Second Inning from 14 to 16. However, the additional two parking spaces were "granted on a temporary basis" and subject to be "withdrawn by the Landlord at his sole discretion and without any justification required for such action."

As with the first lease amendment, the second lease amendment stated that all terms of the initial lease remained in effect unless they were "explicitly amended or cancelled" by the amendment. Marcel signed as "Managing Member" once again.

On July 1, 2016, the parties entered into a third lease amendment, increasing the leased premises an additional 3,819 square feet to 11,019 square feet. Through this amendment, Second Inning intended to expand its operations into RELAP's vacant warehouse space to accommodate its growing clientele. In particular, the lease amendment stated that "Sixteen (16) Parking Stalls will be assigned to present expansion . . . in addition to the Fourteen (14) stalls . . . already assigned to" Second Inning. Exhibit B to the amendment was a color-coded diagram of the parking configuration depicting Second Inning's 14

8

existing assigned parking spaces shown in orange and the 16 additional parking spaces RELAP intended to assign Second Inning shown in blue.

The second paragraph of this lease amendment contained the following recital: "Whereas <u>Tenant desires to start applying for the necessary permits</u> to expand his operation from various Municipal and Governmental Departments and Authorities, with the hope that it will be able to successfully obtain same by or before February 1st, 2017 . . . " (Emphasis added).

Additionally, Section 3 of the amendment provided that "Tenant will perform <u>ALL JOBS</u> pertaining to the modifications of its premises, and those jobs outside of the premises that are caused by such modifications, in particular, those described in EXHIBIT 'C', at its sole expense, and to the satisfaction of the Landlord" (emphasis in original). Exhibit C, entitled "Works to Be Done by Tenant at Tenant's Sole Expense," included all services related to the removal of overhead doors and dock work (modifications pertaining to the space's former use as warehouse space), installation of fire walls, and modification, repair, or replacement of the security, electrical, sprinkler, and HVAC systems (capitalization changed).

As with the first and second lease amendments, the third lease amendment stipulated in paragraph one that all conditions of the prior lease amendments

A-0129-23

were valid unless "explicitly amended or cancelled." Marcel signed as "Manager" on RELAP's behalf once more.[4]

Although the municipal land use board approved the initial 14 and then 16 spaces needed by Second Inning, it rejected the request for 44 more spaces in the third application. The third application was filed by Marcel on behalf of RELAP, not Second Inning., and stated that overnight storage of vehicles would not be permitted, despite Second Inning's operational need for overnight parking.

According to plaintiff, Marcel represented to Second Inning that the land use board had approved the plan with the additional 44 parking spaces before the third lease amendment was signed. However, through Open Public Records Act requests, Second Inning eventually learned that representation was not true.

RELAP terminated the lease because the extra parking spaces had not been authorized, which it claimed violated Second Inning's obligations under the lease to obtain all necessary permits. That prompted Second Inning to file

---

[4] The parties later entered into a fourth lease amendment, which is not pertinent to our analysis, on July 28, 2016. That amendment affected only the "Schedule of Payments" governing the rent and CAM charges. The fourth lease amendment was to run from August 1, 2016 to July 31, 2025. As we will recount, Second Inning's occupancy did not continue that long.

suit against RELAP and its owners in the Chancery Division, asserting various contract and tort claims.

The pretrial judge granted Second Inning a preliminary injunction in October 2018 that prevented defendants from dispossessing Second Inning, and imposed other preliminary measures. The pretrial judge generally denied defendants' motions for summary judgment, except, as we have already noted, to individual co-defendant Nicholas.

As we mentioned above, the pretrial judge perceived genuine issues of material fact existed regarding the parties' obligations under the third lease amendment, particularly concerning who was responsible for obtaining the site plan or other land use approvals required to ensure that Second Inning could continue to operate its adult day care center with adequate parking.

During the ensuing trial in 2022, the trial judge dismissed Second Inning's claims and granted defendants' motions for involuntary dismissal of those claims on various grounds. In his detailed post-trial written opinion, the trial judge explained why he dismissed all remaining claims against RELAP and its individual owners.

Thereafter, in 2023, the trial judge awarded frivolous litigation sanctions of $36,393.95 and $20,159.06, respectively, to Nicholas and the estate of Liliane. The judge determined that Second Inning had pursued litigation in bad

11

faith by filing suit against those two defendants without alleging facts to support a viable claim against either of them.

On appeal, Second Inning argues the trial court erred in entering judgment in favor of defendants, and thus the judgment should be reversed and damages awarded for the return of its rents and lost net income. Second Inning also challenges the trial court's awards of sanctions for filing and pursuing frivolous claims.

In two separate cross-appeals—one by Marcel[5] and the other by RELAP and the rest of the individual defendants—defendants assert that the individual defendants should have prevailed earlier, on summary judgment, because Second Inning had inadequate grounds to establish that those individuals should have been personally liable for any of the tort claims it had raised against RELAP.

## II.

Our appellate review of this nonjury commercial case is guided by well-established principles.

In general, "[f]inal determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review . . . ."

---

[5] We note that Marcel passed away during the pendency of this appeal, and his estate has been substituted into the caption.

Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011). After a non-jury trial, an appellate court "review[s] the trial court's factual findings under a deferential standard: those findings must be upheld if they are based on credible evidence in the record." Motorworld, Inc. v. Benkendorf, 228 N.J. 311, 329 (2017) (citing D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)).

"Reviewing appellate courts should not disturb the factual findings . . . of the trial judge unless convinced those findings . . . were so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (citation and internal quotation marks omitted); see also Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974). The court's findings of fact are "binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998); see also Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 397 (2009).

That said, to the extent that the trial court interpreted the law and the legal consequences that flow from established facts, we review its conclusions de novo. Motorworld, Inc. 228 N.J. at 329 (citing D'Agostino, 216 N.J. at 182; Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Procedurally, the trial judge dismissed Second Inning's claims pursuant to Rule 4:37-2(b), which allows a defendant to move for the dismissal of an action or claim after a plaintiff has rested its case. The rule provides that "such motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in [the] plaintiff's favor." Ibid. A motion for involuntary dismissal is based "on the ground that upon the facts and upon the law the plaintiff has shown no right to relief." ADS Assocs. Grp. v. Oritani Sav. Bank, 219 N.J. 496, 510 (2014) (citing R. 4:37-2(b)). Therefore, "if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied." Prager v. Joyce Honda, Inc., 447 N.J. Super. 124, 134 (App. Div. 2016) (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)).

On the other hand, a dismissal motion made under Rule 4:37-2(b) "should be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Prager, 447 N.J. Super. at 134 (quoting Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008)). This court will apply the same standard as the trial court when reviewing the trial court's determination on a Rule 4:37-

14

2(b) motion.  <u>Prager</u>, 447 N.J. Super. at 134 (citing <u>Smith v. Millville Rescue Squad</u>, 225 N.J. 373, 397 (2016)).

A.

The substantive law applicable to Second Inning's contract-based allegations is well-settled.  A breach of contract claim requires that "a plaintiff . . . provide proof of 'a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and a breach causing the claimant to sustain[] damages.'"  <u>Nelson v. Elizabeth Bd. of Educ.</u>, 466 N.J. Super. 325, 342 (App. Div. 2021) (alteration in original) (quoting <u>Enviro Finance Grp. v. Env't Barrier Co.</u>, 440 N.J. Super. 325, 345 (App. Div. 2015)).

Second Inning further alleges defendants breached a covenant of good faith and fair dealing.  Generally speaking, under New Jersey law, "[a] covenant of good faith and fair dealing is implied in every contract."  <u>Wilson v. Amerada Hess Corp.</u>, 168 N.J. 236, 244 (2001) (citing <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 148 N.J. 396, 420 (1997)).  It requires that "neither party . . . do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  <u>Sons of Thunder</u>, 148 N.J. at 420 (citing <u>Palisades Props., Inc. v. Brunetti</u>, 44 N.J. 117, 130 (1965)).  However, the implied covenant "cannot override an express term in a contract."  <u>Wade v. Kessler Inst.</u>, 172 N.J. 327, 341 (2002) (quoting <u>Wilson</u>, 168 N.J. at 244).

15

It is also well-settled that a court will enforce a contract "based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (quoting Caruso v. Ravenswood Devs., Inc., 337 N.J. Super. 499, 506 (App. Div. 2001)). Where there are no significant "factual disputes, 'the interpretation of a contract is subject to de novo review by an appellate court.'" In re Cnty. of Atlantic, 230 N.J. 237, 255 (2017)(quoting Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011)).

Here, the trial judge dismissed Second Inning's breach of contract claim in Count One, specifically finding that "the duty to apply for site plan approval was clearly [the obligation of Second Inning] pursuant to the initial lease which was not explicitly altered by subsequent leases or actions of the defendant." The judge, likewise, dismissed Count Two of Second Inning's complaint, finding that "the implied covenant of good faith and fair dealing cannot override an express term in a contract." The court reiterated that it was Second Inning's responsibility to obtain site plan approval for parking, as established in the initial lease.

We affirm the trial judge's sound analysis, which is well-supported by the record, the lease documents, and the applicable law. The initial agreement was very clear in imposing on Second Inning the responsibility to "diligently pursue,

16

at its sole cost and expense, all necessary approvals and permits from the Township of Whippany, New Jersey including, but not limited to any necessary Whippany zoning approvals, construction permits, and approval of the New Jersey State Division of Health and Human Services, and from any other governmental instrumentality, board or bureau . . . [.]" That obligation could hardly be made more explicit.

The trial judge sensibly recognized that, as the landlord of the premises, RELAP's support was likely needed to obtain the needed land use approvals and permits. Until the time of the third lease amendment, that cooperation evidently was provided.

The third lease amendment posed a more nuanced question of obligation because of Marcel's conduct in submitting the application for increased parking spaces to the land use board. But the trial judge reasonably construed that conduct as insufficient to shift the ultimate contractual obligation to obtain the approvals and permits from Second Inning to RELAP. The lease is quite clear that "no modifications" of it would be binding "unless reduced to writing and signed by the Landlord and the Tenant." No such mutually signed writing exists. Moreover, the no-waiver provision of the lease disallows the court from deeming Marcel's actions a relinquishment of the landlord's rights. The risks of municipal rejection remained with the tenant.

To be sure, the trial court did not condone Marcel's unilateral actions in filing an application with the township that provided for no overnight parking, and in mispresenting to Second Inning that the extra parking had been approved when, in fact, it had not. Once his actions came to light, however, Second Inning did not file a submission with the land use board, or take any other steps to have the board's denial reconsidered. By that point, the parties' relationship had fractured and Second Inning launched the present litigation. However, none of that changed the clear terms of the contract.

We reject Second Inning's arguments that the "work list" exhibit nullified by omission the tenant's permit-approval-obtaining responsibility. Nor did the recital at the beginning of the third lease amendment, which repeated the "Tenant[s] desire[] to start applying for the necessary permits . . .[.]"

In sum, there was no proven breach of contract here. Moreover, there also was no proven breach of the implied covenant of good faith and fair dealing because the leases explicitly specified in multiple places that Second Inning assumed the obligation to apply for and obtain the needed permits. The trial judge reasoned that the implied covenant cannot override a contrary contractual provision. Wade, 172 N.J. at 341.

A-0129-23

B.

We further discern no reason to set aside the trial judge's dismissal of Second Inning's claims of fraud, fraud in the inducement, and negligent misrepresentation. The evidence supports the judge's finding that, despite Marcel's misrepresentation that the township had approved the extra parking spaces, Second Inning did not prove it had reasonably relied on that assertion. Such proven reliance is needed to sustain a claim of either intentional fraud or negligent misrepresentation. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997) (as to intentional fraud); Carroll v. Cellco P'ship, 313 N.J. Super. 488, 502 (App. Div. 1998) (as to negligent misrepresentation).

C.

Equally without merit are Second Inning's claims of conversion and unjust enrichment. As for conversion, the trial judge reasonably dismissed that claim because there was no evidence that the individual defendants converted anything. The judge duly noted that Second Inning paid the rent monies to RELAP pursuant to the lease, and thus whatever damages plaintiff sought here were "incorporated into the breach of contract claim." Second Inning was obligated to pay rent under the lease, and any benefit that it did not get from paying the rent was encompassed within the breach of contract claim. Second Inning failed to prove that its landlord exercised improper "dominion or control"

19

over its property or funds. <u>Bondi v. Citigroup., Inc.</u>, 423 N.J. Super. 377, 431 (App. Div. 2011) (delineating the elements of conversion). This was fundamentally a business dispute between a landlord and a tenant, not a theft.

Nor were the elements of unjust enrichment proven here, essentially for the same reasons that Second Inning's contractual claims fall short. Because the lease terms plainly imposed on Second Inning the obligation to obtain the necessary municipal approvals, the rents paid to RELAP were not unjustly received benefits. <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J. 539, 554 (1994) (delineating the elements of unjust enrichment).

D.

We have considered Second Inning's remaining arguments for recovery, including but not limited to alleged personal liability of individual codefendants (contrary to the express terms of the leases); tortious interference with business relations, and unclean hands. We have also considered Second Inning's contentions that the trial judge should have awarded it damages. Those arguments, and any others we have not addressed expressly, lack sufficient merit to warrant discussion. <u>R</u>. 2:11-3(e)(1)(E).

20

E.

There is, however, one aspect of the trial court's rulings that warrants correction: the award of frivolous litigation sanctions to Nicholas and Liliane's estate.

The applicable statute and court rule recite a familiar standard: A complaint is frivolous when it "was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury;" or "[t]he nonprevailing party knew, or should have known, that the complaint . . . was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law." N.J.S.A. 2A:15-59.1(b)(1)-(2); see also In re Est. of Ehrlich, 427 N.J. Super. 64, 77 (App. Div. 2012). Under Rule 1:4-8, a court may impose sanctions, "where an attorney or [self-represented litigant] filed a pleading or a motion with an 'improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.'" Bove v. AkPharma Inc., 460 N.J. Super. 123, 148 (App. Div. 2019) (citing Rule 1:4-8).

A claim is considered frivolous only in very limited circumstances: where "no rational argument can be advanced in its support, or it is not supported by any credible evidence, or it is completely untenable." Est. of Ehrlich, 427 N.J.

Super. at 77 (quoting First Atl. Fed. Credit Union v. Perez, 391 N.J. Super. 419, 432 (App. Div. 2007)).

Here, the pretrial judge essentially performed a gatekeeping function that weighs against the alleged frivolity of the lawsuit. That judge, appropriately viewing the then-existing record in a light most favorable to plaintiff as the non-moving party, see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995), perceived that there were genuine issues of material fact that warranted the denial of summary judgment in all but one respect. The pretrial judge also issued preliminary injunctive relief to Second Inning. In those earlier proceedings, the court did not objectively regard the lawsuit as being patently frivolous.

We recognize that the pretrial judge did dismiss the claims against co-defendant Nicholas on summary judgment. We realize that his alleged role in participating in the parties' transactions was not borne out after the pleadings stage. Even so, with all due respect to the trial judge, the complaint's inclusion of claims against Nicholas, and, for that matter, his co-defendant sister Liliane—both of whom were part owners of RELAP—do not appear to rise to the extreme level of frivolity contemplated under the statute and rule. The trial court therefore misapplied its discretion in singling out the complaint's over-inclusiveness in encompassing those individuals. Masone v. Levine, 382 N.J.

22

Super. 181, 193 (App. Div. 2005) (noting the appellate court's limited authority to vacate sanctions).

That said, we reject defendants' arguments that sanctions should also have been awarded in favor of Alan, Marcel, and Roger. Again, this was a hard-fought business dispute that ultimately was decided only after months of trial, and not a patently frivolous misuse of the court system.

## III.

Defendants' cross-appeals complaining about the trial court's denial of summary judgment has no merit. In retrospect, the court, with the benefit of a well-developed record of trial testimony and documentary exhibits, was persuaded that plaintiff could not sustain its burden of proof. But that does not mean that summary judgment was improperly denied by the pretrial judge, who had a much more limited vantage point.

Affirmed in part as to the merits, reversed as to imposition of fee-shifting sanctions.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division